# 14-4104(L), 14-3589(CON),

## 14-3607(CON), 14-4129(CON), 14-4130(CON), 14-4131(CON), 14-4132(CON),

## 14-4135(CON), 14-4136(CON), 14-4137(CON), 14-4138(CON), 14-4139(CON),

# United States Court of Appeals

*for the*

# Second Circuit

SAKWE BALINTULO, as personal representative of
SABA BALINTULO, *et al.*,

*Plaintiffs-Appellants,*

*(For Continuation of Caption See Inside Cover)*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK, NO. 02-MD-1499
HONORABLE SHIRA A. SCHEINDLIN, U.S. DISTRICT JUDGE

## *AMICUS CURIAE* BRIEF OF DAVID J. SCHEFFER IN SUPPORT OF APPELLANTS

SUSAN V. TIPOGRAPH, ESQ.
11 Park Place, Suite 914
New York, New York 10007
(212) 431-5360

DAVID J. SCHEFFER, ESQ.
CENTER FOR INTERNATIONAL
 HUMAN RIGHTS
NORTHWESTERN UNIVERSITY
 SCHOOL OF LAW
375 East Chicago Avenue
Chicago, Illinois 60611
(312) 503-2224

*Counsel for Amicus Curiae*

− v. −

FORD MOTOR CO., INTERNATIONAL BUSINESS MACHINES CORP.,

*Defendants-Movants,*

GENERAL MOTORS CORP.,

*Defendant.*

LUNGISILE NTZEBESA, DOROTHY MOLEFI, TOZAMILE BOTHA,
MNCEKELELI HENYN SIMANGENTLOKO, SAMUEL ZOYISILE MALI,
MSITHELI WELLINGTON NONYUKELA, MPUMELELO CILIBE,
WILLIAM DANIEL PETERS, JAMES MICHAEL TAMBOER,
NONKULULEKO SYLVIA NGCAKA, individually and on behalf of her
deceased son, NOTHINI BETTY DYONASHE, individually and on behalf of her
deceased son, MIRRIAM MZAMO, individually and on behalf of her deceased
son, LESIBA KEKANA, DENNIS VINCENT FREDERI BRUTUS, MARK
FRANSCH, ELSIE GISHI, THOBILE SIKANI, REUBEN MPHELA,
CATHERINE MLANGENI, ARCHINGTON MADONDO, MICHAEL MBELE,
THULANI NUNU, MAMOSADI MLANGENI, THANDIWE SHEZI,
SAKWE BALINTULO,

*Plaintiffs - Appellants,*

SIGQIBO MPENDULO, NYAMEKA GONIWE, THEMBA MEQUBELA,
ANDILE MFINGWANA, F. J. DLEVU, unlawfully detained and tortured during
period 1964/4, LWAZI PUMELELA KUBUKELI, unlawfully forced to flee into
exile in 1985, FRANK BROWN, P. J. OLAYI, SYLVIA BROWN, H.
DURHAM, M.D., WELLINGTON BANINZI GAMAGU, Violations of Pass
Laws, unlawful detention 19811983, torture subjected to discriminatory labor
practices 1981, HERMINA DIGWAMAJE, SAKWE BALINTULO
KHULUMANI,

*Plaintiffs,*

HANS LANGFORD PHIRI,

*ADR Provider-Appellant,*

− v. −

SULZER AG, DAIMLERCHRYSLER NORTH AMERICA HOLDING
CORPORATION, DEBEERS CORPORATION, SCHINDLER HOLDING AG,
NOVARTIS AG, ANGLO-AMERICAN CORPORATION, BANQUE INDO
SUEZ, CREDIT LYONNAIS, and Unknown officers and directors of Danu
International., STANDARD CHARTERED BANK PLC, CITIGROUP AG, J.P.
MORGAN SECURITIES INC., as successor to Morgan Guaranty,
MANUFACTURERS HANOVER, CHEMICAL BANK & CHASE
MANHATTAN BANK, CORPORATE DOES, COMMERZBANK AG,
CREDIT SUISSE, CITIGROUP INC., DEUTSCHE BANK AG, UBS AG,
DRESDNER BANK AG, UNISYS CORPORATION, SPERRY

CORPORATION; BURROUGHS CORPORATION, ICL, LTD., JOHN DOE
CORPORATION, AMDAHL CORP., COMPUTER COMPANIES, FORD
MOTOR COMPANY, FORD MOTOR COMPANY, HOLCIN, LTD., HENRY
BLODGET, MERRILL LYNCH & CO., INC., KIRSTEN CAMPBELL,
KENNETH M. SEYMOUR, JUSTIN BALDAUF, THOMAS MAZZUCCO,
VIRGINIA SYER GENEREUX, SOFIA GHACHEM, JOHN DOE, Defendants 1
through 10, EDWARD MCCABE, DEEPAK RAJ, Corporate Does, 1-100, their
predecessors, successors and/or assigns, OERLIKON CONTRAVES AG,
EXXON MOBIL CORPORATION, OERLIKON BUHRLE AG, SHELL OIL
COMPANY, SHELL PETROLEUM, INC., ROYAL DUTCH PETROLEUM
CO., SHELL TRANSPORT & TRADING COMPANY PLC, NATIONAL
WESTMINSTER BANK PLC, MINNESOTA MINING AND
MANUFACTURING COMPANY/3M COMPANY, FUJITSU LTD.,
BARCLAYS NATIONAL BANK LTD., DAIMLER AG, GENERAL MOTORS
CORPORATION, INTERNATIONAL BUSINESS MACHINES
CORPORATION, UNION BANK OF SWITZERLAND AG,

*Defendants-Appellees,*

RHEINMATALL GROUP AG, BARCLAYS BANK PLC,

*Defendants.*

───────────────────────────────────────

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................. ii

INTEREST OF THE AMICUS CURIAE ............................................... 1

SUMMARY OF ARGUMENT ............................................................ 3

ARGUMENT ................................................................................... 6

   I.    THE ROME STATUTE DOES NOT EMBRACE A
       SPECIFIC INTENT REQUIREMENT FOR A MENS REA
       ANALYSIS OF AIDING AND ABETTING ..................................... 6

       A.    Recently Other Circuits and the International Criminal
            Tribunals Reaffirm Use of the Knowledge Standard for
            Aiding and Abetting .............................................................. 6

       B.    Recent Scholarly Confirmation of the *Mens Rea*
            Standard for Aiding and Abetting Liability under the
            Rome Statute of the International Criminal Court ................... 14

   II.    The Absence of Corporate Liability Under the Statutes of the
       International Criminal Tribunals Does Not Negate Corporate
       Civil Liability Under the Alien Tort Statute ................................ 19

CONCLUSION ................................................................................ 23

i

# TABLE OF AUTHORITIES

**Page(s)**

**Cases:**

*Aziz v. Alcolac*,
    658 F.3d 388 (4th Cir. 2011) ....................................................................11

*Bowoto v. Chevron Corp.*,
    No. C99-02506 SI, 2006 WL 2455752 (N.D. Cal. Aug. 22, 2006) ...............6

*Cabello v. Fernández-Larios*,
    402 F.3d 1148 (11th Cir. 2005) ....................................................................6

*Co-Prosecutors v. Kaing Guek Eav*,
    Case No. 001/18-07-2007/ECCC/TC, Judgment (July 26, 2010).................7

*Co-Prosecutors v. Nuon Chea and Khieu Samphan*,
    Case No. 002/19-09-2007/ECCC/TC, Judgment (Aug. 7, 2014)..................7

*Doe I v. Nestle USA, Inc.*,
    766 F.3d 1013 (9th Cir. 2014) .......................................................................7

*Doe v. Exxon Mobil Corp.*,
    654 F.3d 11, 39 (D.C. Cir. 2011), *vacated on other grounds*,
    527 F. App'x 7 (D.C. Cir. 2013) ...................................................................6

*Doe v. Rafael Saravia*,
    348 F. Supp. 2d 1112 (E.D. Cal. 2004) .........................................................6

*In re S. African Apartheid Litig.*,
    15 F. Supp. 3d 454 (S.D.N.Y., Aug. 28, 2014) ...........................................19

*In re S. African Apartheid Litig.*,
    No. 02 Civ. 4712(SAS), 2014 WL 1569423
    (S.D.N.Y. Apr. 17, 2014) ...............................................................................5

*Kiobel v. Royal Dutch Petroleum Co.* (*Kiobel I*),
    621 F.3d 111 (2d Cir. 2010) ..............................................................*passim*

*Kiobel v. Royal Dutch Petroleum Co.* (*Kiobel II*),
    133 S. Ct. 1659 (2013)........................................................................*passim*

*Presbyterian Church of Sudan v. Talisman Energy, Inc.* (*Talisman*),
    582 F.3d 244 (2d Cir. 2009) ...............................................................*passim*

*Presbyterian Church of Sudan, v. Talisman Energy, Inc.*,
  131 S. Ct. 79 (2010)........................................................................................3

*Prosecutor v. Blaškić*,
  Case No. IT-95-14-A, Judgment (Int'l Crim. Trib. for the former
  Yugoslavia July 29, 2004) ..............................................................................7

*Prosecutor v. Blé Goudé* (*Blé Goudé*),
  Case No. ICC-02/11-2/11, Decision on the Confirmation of Charges
  Against Charles Blé Goudé (Dec. 11, 2014) ................................9, 10, 13, 14

*Prosecutor v. Furundžija*,
  Case No. IT-95-17/1-T, Judgment (Int'l Crim. Trib. for the former
  Yugoslavia Dec. 10, 1998) ..............................................................................7

*Prosecutor v. Krnojelac*,
  Case No. IT-97-25-A, Judgment (Int'l Crim. Trib. for the former
  Yugoslavia Sept. 17, 2003)............................................................................14

*Prosecutor v. Mrkšić*,
  Case No. IT-95-13/1-A, Judgment (Int'l Crim. Trib. for the former
  Yugoslavia May 5, 2009) .................................................................................7

*Prosecutor v. Ntakirutimana*,
  Cases No. ICTR-96-10-A and ICTR-96-17-A, Judgment
  (Dec. 13, 2004) .......................................................................................13, 14

*Prosecutor v. Orić*,
  Case No. IT-03-68-A, Judgment (Int'l Crim. Trib. for the former
  Yugoslavia July 3, 2008) .................................................................................7

*Prosecutor v. Perišić (Perišić*),
  Case No. IT-04-81-A, Judgment (Int'l Crim. Trib. for the former
  Yugoslavia Feb. 28, 2013).............................................................. 6-7, 10 ,12

*Prosecutor v. Śainović (Śainović*),
  Case No. IT-05-87-A, Judgment (Int'l Crim. Trib. for the former
  Yugoslavia Jan. 23, 2014) ...........................................................6, 10, 12, 24

*Prosecutor v. Taylor*,
  Case No. SCSL-03-01-T, Judgment (May 30, 2012)....................................7

*Prosecutor v. Vujadin Popović (Vujadin Popović*),
  Case No. IT-05-88-A, Judgment (Int'l Crim. Trib. for the former
  Yugoslavia Jan. 30, 2015) ....................................................................*passim*

iii

**Statutes & Other Authorities:**

28 U.S.C. § 1350 (2012) ........................................................2

Rome Statute, art. 10..................................................19, 20

Rome Statute, art. 25(3)(c).........................................*passim*

David Scheffer & Caroline Kaeb, *The Five Levels of CSR Compliance: The Resiliency of Corporate Liability Under the Alien Tort Statute and the Case for a Counterattack Strategy in Compliance Theory*, 29 BERKELEY J. INT'L LAW 334 (2011).........................................8

James G. Stewart, *The Important New Orthodoxy on Complicity in the ICC Statute* (January 21, 2015) ....................................... 14-15, 17

Leila Nadya Sadat, International Decisions, Can the ICTY *Šainović* and *Perišić* Cases be Reconciled? 108 AM. J. INT'L L. 475 (2014)....................10

Thomas Weigend, *How to Interpret Complicity in the ICC Statute* (Dec. 15, 2014) ..............................................18

## INTEREST OF THE AMICUS CURIAE[1]

David J. Scheffer is the Mayer Brown/Robert A. Helman Professor of
Law and Director, Center for International Human Rights at Northwestern
University School of Law, where he teaches international criminal law and
international human rights law. He served as U.S. Ambassador-at-Large for
War Crimes Issues (1997–2001) and was deeply engaged in the policy
formulation, negotiations, and drafting of the constituent documents
governing the International Criminal Court. He led the U.S. delegation that
negotiated the Rome Statute of the International Criminal Court, adopted
July 17, 1998, 2187 U.N.T.S. 19, available at http://www.icc-cpi.int/iccdocs/
PIDS/publications/RomeStatutEng.pdf (hereinafter "Rome Statute"), and its
supplemental documents from 1997 to 2001. He was deputy head of the
delegation from 1995 to 1997. On behalf of the U.S. Government, he also
negotiated the statutes of and coordinated support for the International
Criminal Tribunals for the former Yugoslavia (ICTY) and Rwanda (ICTR),
the Special Court for Sierra Leone (SCSL), and the Extraordinary Chambers

---

[1] All counsel of record have consented to the filing of this brief and the consent letters
have been filed with the Clerk of the Court. No counsel for any party authored this brief
in whole or in part, and no person or entity, other than the *amicus curiae*, made a
monetary contribution to the preparation or submission of this brief.

in the Courts of Cambodia (ECCC) (together with the International Criminal Court, hereinafter the "tribunals").

Ambassador Scheffer submits this brief to demonstrate that the Plaintiffs should be granted leave to amend the complaints because (1) the totality of evidence, including new evidence, of the Defendants' complicity in the implementation of apartheid in South Africa demands scrutiny under an aiding and abetting standard that reflects a proper interpretation of the Rome Statute of the International Criminal Court, which this Circuit found in its judgment in *Presbyterian Church of Sudan v. Talisman Energy, Inc.* (*Talisman*), 582 F.3d 244 (2d Cir. 2009), to be a primary authority for such standard, and (2) corporate liability under the Alien Tort Statute, 28 U.S.C. § 1350 (2012), which was implicitly sustained by the Supreme Court in its judgment in *Kiobel v. Royal Dutch Petroleum Co.* (*Kiobel II*), 133 S. Ct. 1659 (2013), should no longer be undermined by an erroneous interpretation of the negotiations leading to the Rome Statute, which excludes corporate liability.

## SUMMARY OF ARGUMENT

My earlier amicus curiae briefs in *Talisman, Kiobel v. Royal Dutch Petroleum Co.* (*Kiobel I*), 621 F.3d 111 (2d Cir. 2010) (*Kiobel I*), and *Kiobel II* examined aiding and abetting liability and corporate liability under international law and in relation to the Rome Statute, two issues of fundamental importance to this stage of the proceedings in this case. Brief of David J. Scheffer, Director of the Center for International Human Rights, as Amicus Curiae in Support of the Issuance of a Writ of Certiorari, *Presbyterian Church of Sudan, v. Talisman Energy, Inc.*, 131 S. Ct. 79 (2010) (No. 09-1262) [hereinafter *Talisman* brief]; Brief of David J. Scheffer as Amicus Curiae in Support of the Issuance of a Writ of Certiorari, *Kiobel II*, 133 S. Ct. at 1659 (No. 10-1491); Brief of Ambassador David J. Scheffer, Northwestern University School of Law, as Amicus Curiae in Support of the Petitioners, *Kiobel II*, 133 S. Ct. at 1659 (No. 10-1491) [hereinafter *Kiobel* Brief] and thereafter Brief in Support of the Petitioners and Supplemental Brief in Support of the Petitioners, *Kiobel II*, 133 S. Ct. at 1659 (No. 10-1491) [hereinafter Supplemental *Kiobel* Brief].

Like those briefs, this submission is offered to elucidate, particularly in light of very recent jurisprudence and scholarship, that the Rome Statute does *not* require specific intent for aiding and abetting. The Rome Statute

requires that the alleged perpetrator *intends to facilitate* the commission of the crime and acts with the *knowledge* that the consequence will occur in the ordinary course of events. If this Circuit is to continue to rely as heavily on the Rome Statute as it did in *Talisman* and again in *Kiobel I* to establish aiding and abetting liability under international law, then revisiting the Rome Statute, recent jurisprudence, and scholarly work demonstrates that the new evidence would be relevant to the question of the Defendants' liability as aiders and abettors.

The decision below additionally touched on two other issues – concerns about the use of the Alien Tort Statute to reach extraterritorial acts with inadequate links to the United States, and whether the ATS or customary international law imposes corporate liability. As to the first, if the Court agrees that aiding and abetting liability does not require the highest mens rea level of specific intent, that resolution would also affect the extraterritoriality concerns; the new evidence of accessorial participation in apartheid demonstrates integrated corporate decision-making in the United States, which would be sufficient under the appropriate mens rea standard to overcome concerns that the ATS was invoked to reach largely or exclusively extraterritorial conduct.

As elaborated below, the Supreme Court's implicit acceptance of corporate liability under the Alien Tort Statute in *Kiobel II* – recognized by the lower court's recent post-*Kiobel II* conclusion "that actions under the ATS can be brought against corporations," *see In re S. African Apartheid Litig.*, No. 02 Civ. 4712(SAS), 2014 WL 1569423, at *8–9 (S.D.N.Y. Apr. 17, 2014) -- goes a long way to resolving the second issue, regarding the liability of corporations for tortious conduct. Notwithstanding that decision, the defense contends that corporate liability is inconsistent with customary international law, based on the absence of corporate liability under the statutes of the international criminal tribunals (particularly those of the ICTY, ICTR, and the International Criminal Court). Contrary to that argument, those tribunals' criminal statutes do not establish a rule under customary international that would preclude civil liability for corporations that are complicit in the commission of torts or crimes that fall within the jurisdiction of, for example, the Alien Tort Statute.

In short, the Court should reject the insistence that aiding and abetting requires specific intent on the part of the actors to commit the crimes, agree that corporate civil liability is permissible under the statute and not barred by customary international law and remand the case for further proceedings relating to the amended complaints.

# ARGUMENT

## I. THE ROME STATUTE DOES NOT EMBRACE A SPECIFIC INTENT REQUIREMENT FOR A MENS REA ANALYSIS OF AIDING AND ABETTING

### A. Recently Other Circuits and the International Criminal Tribunals Reaffirm Use of the Knowledge Standard for Aiding and Abetting

For several years this Circuit conflated "purpose" with "specific intent" in examining the *mens rea* of aiding and abetting liability in the commission of genocide, crimes against humanity, and war crimes. *Kiobel I*, 621 F.3d at 149; *Talisman*, 582 F.3d at 259. This is a mistaken view of *mens rea* with respect to (1) views repeatedly held by several other Circuits, *see, e.g.*, *Doe v. Exxon Mobil Corp.*, 654 F.3d 11, 39 (D.C. Cir. 2011), *vacated on other grounds*, 527 F. App'x 7 (D.C. Cir. 2013); *Cabello v. Fernández-Larios*, 402 F.3d 1148, 1158–59 (11th Cir. 2005); *Bowoto v. Chevron Corp.*, No. C99-02506 SI, 2006 WL 2455752, at *3-4 (N.D. Cal. Aug. 22, 2006); *Doe v. Rafael Saravia*, 348 F. Supp. 2d 1112, 1148–49 (E.D. Cal. 2004), and (2) the statutes and jurisprudence of the tribunals, *see, e.g.*, *Co-Prosecutors v. Nuon Chea and Khieu Samphan* Case No. 002/19-09-2007/ECCC/TC, Judgment, ¶ 704  (Aug. 7, 2014); *Prosecutor v. Šainović* (*Šainović*), Case No. IT-05-87-A, Judgment, ¶ 1772 (Int'l Crim. Trib. for the former

Yugoslavia Jan. 23, 2014); *Prosecutor v. Taylor*, Case No. SCSL-03-01-T, Judgment, ¶¶ 486–87 (May 30, 2012); *Prosecutor v. Perišić (Perišić)*, Case No. IT-04-81-A, Judgment, ¶ 48 (Int'l Crim. Trib. for the former Yugoslavia Feb. 28, 2013); *Co-Prosecutors v. Kaing Guek Eav*, Case No. 001/18-07-2007/ECCC/TC, Judgment, ¶ 535 (July 26, 2010); *Prosecutor v. Mrkšić*, Case No. IT-95-13/1-A, Judgment, ¶ 159 (Int'l Crim. Trib. for the former Yugoslavia May 5, 2009); *Prosecutor v. Orić*, Case No. IT-03-68-A, Judgment, ¶ 43 (Int'l Crim. Trib. for the former Yugoslavia July 3, 2008); *Prosecutor v. Blaškić*, Case No. IT-95-14-A, Judgment, ¶ 49 (Int'l Crim. Trib. for the former Yugoslavia July 29, 2004); *Prosecutor v. Furundžija*, Case No. IT-95-17/1-T, Judgment, ¶ 245 (Int'l Crim. Trib. for the former Yugoslavia Dec. 10, 1998). Significantly, the Ninth Circuit Court of Appeals recently clarified the *mens rea* standard for aiding and abetting liability. *Doe I v. Nestle USA, Inc.*, 766 F.3d 1013, 1023–26 (9th Cir. 2014). The Appeals Chamber of the ICTY, just days prior to the filing of this amicus brief, explicitly upheld the knowledge standard for aiding and abetting liability and explicitly rejected the "specific direction" view for either the *actus reus* or *mens rea* of aiding and abetting liability. *Prosecutor v. Vujadin Popović* (*Vujadin Popović*), Case No. IT-05-88-A, Judgment, ¶¶ 1732, 1758 (Int'l Crim. Trib. for the former Yugoslavia Jan. 30, 2015).

As the U.S. Government's lead Rome Statute negotiator, I have explained at considerable length in my earlier briefs (cited above) and scholarship[2] that the term "purpose" in Article 25(3)(c) of the Rome Statute embodies a compromise on aiding and abetting liability and does not, and was not intended to, reflect customary international law:

> The negotiating history of Article 25(3)(c) demonstrates that there was no definitive agreement pointing to either an intention standard or a knowledge standard with respect to aiding and abetting liability. The compromise "purpose" language chosen for Article 25(3)(c) reflects the obvious point that an aider or abettor purposely acts in a manner that has the consequence of facilitating the commission of a crime. The aider or abettor's intention in so acting, however, cannot be established without reference to the mens rea principles set forth in Article 30 of the Rome Statute.

*Talisman* brief, *supra*, at 4.The aider and abettor need not share in the perpetrator's intent, and certainly not any specific intent, that the underlying crime be committed, but merely assist with the intent to do that which the aider and abettor is actually doing, with the result that the action facilitates the crime and that the aider or abettor acts knowing that the crime may be facilitated as a consequence of such action.

---

[2] *See* David Scheffer & Caroline Kaeb, *The Five Levels of CSR Compliance: The Resiliency of Corporate Liability Under the Alien Tort Statute and the Case for a Counterattack Strategy in Compliance Theory*, 29 BERKELEY J. INT'L LAW 334, 348–357 (2011).

On December 11, 2014, the Pre-Trial Chamber of the International

Criminal Court expressed its view on the requirements of aiding and abetting

under the Rome Statute:

> Article 25(3)(c) of the Statute provides for individual
> criminal responsibility if a person, for the *purpose of
> facilitating* the commission of a crime within the jurisdiction
> of the Court, "aids, abets or otherwise assists in its
> commission or its attempted commission, including
> providing the means for its commission". In essence, what is
> required for this form of responsibility is that the person
> provides assistance to the commission of a crime and that, in
> engaging in this conduct, he or she *intends to facilitate* the
> commission of the crime.

*Prosecutor v. Blé Goudé* (*Blé Goudé*), Case No. ICC-02/11-2/11, Decision

on the Confirmation of Charges Against Charles Blé Goudé, ¶ 167 (Dec. 11,

2014) (*emphasis added*).  Based on this interpretation of aiding and abetting

liability, the Pre-Trial Chamber confirmed the charges against Charles Blé

Goudé on aiding and abetting and concluded that his actions "were

intentional and were performed for the purpose of *facilitating* the

commission of the crimes. In addition, they were performed in the

*knowledge* that the crimes were committed as part of a widespread and

systematic attack against the civilian population, namely known or perceived

supporters of [his political opponent]." *Id.* ¶ 170. (*emphasis added*)

9

This is emphatically *not* a determination that the Rome Statute requires specific intent to commit the crime for aiding and abetting liability. Rather, it requires that there be the intent to *facilitate* the commission of the crime. Nothing in the Pre-Trial Chamber's jurisprudence suggests that the aider and abettor must share either the perpetrator's intent or specific intent to commit the particular crime. The Pre-Trial Chamber interpreted "purpose" to mean "intends to facilitate" the commission of the crime, not the intent or specific intent to commit the crime.[3]

The judges of the International Criminal Court are the authoritative arbiters of the Rome Statute. As the arbiters, in *Blé Goudé* the Pre-Trial Chamber aligned its statutory interpretation closer to the jurisprudence of the other tribunals, including the ICTY, whose Appeals Chamber recently reaffirmed the knowledge test in *Śainović* and *Popović*.[4] The Pre-Trial Chamber also aligned the Court with several federal circuits that hold the knowledge standard for aiding and abetting liability is established under customary international law, at the same time implicitly rejecting the

---

[3] Nor does the partly dissenting opinion contradict the majority's understanding of aiding and abetting liability. *Blé Goudé*, Case No. ICC-02/11-2/11, Partly Dissenting Opinion of Judge Christine Van den Wyngaert (Dec. 11, 2014).

[4] In so doing, it retrenched from the outlier and widely criticized ruling in Perišić, Case No. IT-04-81-A, Judgment, which is succinctly examined in Leila Nadya Sadat, International Decisions, Can the ICTY Śainović and Perišić Cases be Reconciled? 108 AM. J. INT'L L. 475 (2014).

misinterpretations of the Rome Statute by this Circuit and the Fourth Circuit,

*Aziz v. Alcolac*, 658 F.3d 388 (4th Cir. 2011); *Talisman,* 582 F.3d 244.

If there were any lingering doubt about the *mens rea* element for

aiding and abetting in the ICTY, the Appeals Chamber's most recent

(January 30, 2015) decision, referred to above, explicitly rejected any

"specific direction" element of aiding and abetting liability, endorsing

instead the "knowledge" standard for the *mens rea* of aiding and abetting

liability. *Vujadin Popović*. The key extracts from the Appeals Chamber's

judgment confirming the convictions of five Bosnian Serbs for atrocity

crimes committed at Srebrenica in 1995 follow:

> 1732. [T]he actus reus for aiding and abetting "consists of practical assistance, encouragement, or moral support which has a substantial effect on the perpetration of the crime" and the mens rea requires "knowledge that these acts assist the commission of the offense."  The mens rea also requires that the aider and abettor was aware of the essential elements of the crime which was ultimately committed, including the intent of the principal perpetrator.  It is not necessary that the aider and abettor know the precise crime that was intended and was in fact committed—if he is aware that one of a number of crimes will probably be committed, and one of those crimes is committed, he has intended to facilitate the commission of that crime, and is guilty as an aider and abettor. ****

> 1758.  "'[S]pecific direction' is not an element of aiding and abetting liability under customary international law."  The * * * actus reus of aiding and abetting "consists of practical assistance, encouragement, or moral support which has a substantial effect on the perpetration of the crime" and the

11

> mens rea is "the knowledge that these acts assist the commission of the offense." The Appeals Chamber therefore dismisses Pandurević's argument to incorporate a requirement of specific direction in the mens rea or the actus reus for aiding and abetting. Accordingly, the Appeals Chamber also dismisses Pandurević's argument that it was required that his failure to act was purposeful."

*Vujadin Popović*, ¶¶ 1732, 1758 (footnotes omitted, but cite *Sainović*, which explicitly rejected *Perišić*, and do not cite *Perišić* at all).

The Rome Statute may suggest a more rigorous standard of intent ("intent to facilitate") for aiding and abetting liability when compared with the knowledge-alone standard long required under customary international law and recently confirmed in *Popović*. But that distinction only demonstrates that "intent to facilitate" does not reflect customary international law on the issue of aiding and abetting liability. Nor can Article 25(c)(3) of the Rome Statute extinguish customary international law reflected in the jurisprudence of the ICTY, ICTR, SCSL, and ECCC. Indeed, the recent jurisprudence of the Pre-Trial Chamber moves the International Criminal Court closer to the knowledge standard long established in customary international law.

In any event, as I pointed out in my amicus brief in *Talisman*, it is surprising that a U.S. federal court would rely heavily on the unratified Rome Statute for guidance on the interpretation of aiding and abetting

liability when more authentic guidance is found in federal common law, which for cases of this character is informed by customary international law that has been unquestionably shaped by the rich body of jurisprudence delivered by the ICTY, ICTR, SCSL, and ECCC, particularly in recent years. *Talisman* brief, *supra*, at 26–27.

One outcome is certain if one seeks guidance from the International Criminal Court's judges: in *Blé Goudé,* aiding and abetting liability rests on the fundamental premise that *mens rea* is established by an intent to facilitate the commission of a crime and an awareness, or knowledge, that a crime will occur in the ordinary course of events. The ruling in *Blé Goudé* falls far short of what this Circuit found in *Talisman* and *Kiobel I*, which in fact would require that aiders and abettors be indistinguishable from principals ("co-perpetrators") in the direct commission of the crime. The Prosecutor of the International Criminal Court correctly pointed out the absurdity of any attempt to equate the intent to aid and abet with specific intent, *Blé Goudé* at 80–81, particularly where "specific intent" has a unique meaning under international criminal law in connection with the crime of genocide and the crime against humanity of persecution. *See, e.g., Prosecutor v. Ntakirutimana*, Cases No. ICTR-96-10-A and ICTR-96-17-A, Judgment, ¶¶ 500–01 (Dec. 13, 2004).

An accomplice must share the intent of the perpetrator to be found guilty of genocide or persecution. *Id.; see also Prosecutor v. Krnojelac*, Case No. IT-97-25-A, Judgment, ¶ 52 (Int'l Crim. Trib. for the former Yugoslavia Sept. 17, 2003). However, there is no similar specific intent requirement under international law for the commission of apartheid. Therefore aiding and abetting the crime of apartheid is regulated by the widely supported customary international law standard of knowledge for the *mens rea* and, if one seeks guidance from the Rome Statute, an intent to facilitate with the knowledge that the consequence will occur in the ordinary course of events.

**B.  Recent Scholarly Confirmation of the *Mens Rea* Standard for Aiding and Abetting Liability under the Rome Statute of the International Criminal Court**

At a recent symposium convened by Allard School of Law, University of British Columbia, leading scholars of international criminal law examined the *mens rea* standard for aiding and abetting liability under the Rome Statute.  Assistant Professor James G. Stewart, who organized the symposium, summarized the scholarly papers in *The Important New Orthodoxy on Complicity in the ICC Statute* (January 21, 2015), *available at* http://jamesgstewart.com/the-important-new-orthodoxy-on-

14

complicity-in-the-icc-statute/ [hereafter *New Orthodoxy*].[5] Professor
Stewart writes that from this "significant cross-section of experts who have
worked very extensively on these topics for a large number of years, I
believe their shared opinion holds great weight in this regard." *Id.*

Indeed, Professor Stewart, who previously interpreted Article 25(3)(c)
from a perspective quite similar to this Circuit's, has changed his view
following his examination of the negotiating record of the Rome Statute and
the scholarship by the legal scholars, including but not limited to those who
participated in the symposium. All of these scholars reached a generally
common view that the *mens rea* of aiding and abetting under the Rome
Statute has two prongs: the reference to "purpose" in Article 25(3)(c)
attaches to the act of facilitation and not to the consummated offense, and
the mental element is discovered *either* in the fact that the person means to
cause the consequence or is aware that it will occur in the ordinary course of
events.

Professor Stewart's more detailed explanation, summarizing the views
of the scholars participating in the symposium as well as others not
participating, follows:

---

[5] The eight scholarly papers constituting the symposium on "Complicity in the ICC
Statute" can be found at http://jamesgstewart.com/list-of-previous-symposia/.

15

[T]he mental element of aiding and abetting in the ICC Statute should be interpreted as requiring a _double test_ that is comprised of the following _two_ elements:

1. <u>As for the fact of assistance, the accomplice must purposefully do that which facilitates the crime (or attempt to do that which would facilitate the crime)</u> – The "purpose" requirement does not go to the consummated offence, it attaches to the act of facilitation.  An accomplice cannot facilitate by negligence or recklessness, say by forgetfully leaving a gun on the kitchen table that someone else uses to murder a third party, but she is responsible for an international crime that requires intent (say deportation as a crime against humanity) if she purposefully supplies the weapon to the perpetrator, in the awareness that it will be used to forcibly displace civilians as part of a widespread and systematic attack in the ordinary course of events.  For clarity, I use language in the heading above that deliberately steers clear of describing this requirement as "for the purpose of helping" or "for the purpose to assist", because the words "help" and "assist" often (wrongly) imply some type of disposition towards to [sic] consummated crime when, as we will see below, this language is really meant to reference the conduct that facilitates the crimes;

<u>and</u>

2.  <u>As for the criminal result of the facilitation (whether attempted or completed), the accomplice must have whatever mental element is announced in the crime charged.</u>  Importantly, this second element arises from Art 30 of the statute, which stipulates that mental elements require intention and knowledge "unless otherwise provided" elsewhere.  Thus, because Art 25(3)(c) is silent as to the mental element for consequences of an aider and abettor's assistance, we should use definitions contained in Article 30 to fill this void.  After all, this is how we read all the other forms of participation in Articles 25(3)(c) through (d).  Thus, because the vast majority of international crimes are silent as to the mental element, Article 30 stipulates that the accomplice is liable if "in relation

16

to a consequence, that person means to cause that consequence or is aware that it will occur in the ordinary course of events." A minority of crimes explicitly raise the mental element higher by demanding a special intent (think genocide, persecution, torture), whereas a few drop it lower (think of the war crime of using, conscripting or enlisting children in Art. 8(2)(b)(xxvi), which only requires that "[t]he perpetrator knew or should have known that such person or persons were under the age of 15 years." This is negligence) For these exceptional offenses, the mental element for the accomplice is "otherwise provided for" by the crime. For all others, the lowest standard of intention applies, meaning that an accomplice will be found guilty if he purposefully provides the assistance, "aware that it [the prohibited result] will occur in the ordinary course of events." Stewart.

*Id.*

Thomas Weigend, Professor of International, Comparative and German Criminal Law at the University of Cologne, also has rethought the *mens rea* standard for aiding and abetting under the Rome Statute. In the paper he submitted for the symposium he explained:

The [Rome] Statute speaks [in Article 25(3)(c)] of "the purpose of facilitating the commission of such a crime"; the assistant's purpose thus is not the crime but the facilitation. This means that the assistant's objective must be to facilitate the act of the main perpetrator; but her will need not encompass the result of the perpetrator's conduct. For example, if an arms trader sells weapons to a dictator, he will be punishable only if he does so with the purpose of facilitating the dictator's use of armed force; but the fact that the armed force will be used against unarmed civilians and will therefore constitute a crime against humanity need not be the arms dealer's "purpose".... In what I said so far, I assumed as true the widely shared assumption that the words "for the purpose" describe a special mental element of assisting under Art. 25(3)(c). But there is a plausible alternative

17

reading of these words, which has been spelled out by Antje
Heyer in her excellent and extensive analysis of liability for aiding
and abetting in [international criminal law] (published in 2013 in
German under the title *Grund und grenze de Beihifestrafbarkeit
im Volkerstrafrecht*, pp. 500–01; for a similar interpretation, see
Katherine Gallagher, '*Civil Litigation and Transnational
Business'*, 8 JICJ 745 at 765 (2008)). "For the purpose of
facilitating the commission" can also be interpreted as an element
of the actus reus of assisting: the assistant's conduct must be
specifically shaped in a way as to be of use to the perpetrator.
Under this interpretation, conduct that is part of a person's normal
business would not qualify as assistance, because that conduct
would not have the objective purpose of facilitating someone's
crime.  If, for example, an arms trader sells weapons to a dictator
at their regular price and under regular conditions, he would not
be an assistant to crimes against humanity even if he is aware that
such crimes will be committed using these weapons.  But if the
trader sells the weapons at a higher price because of an existing
embargo, or if he sells weapons that have been specifically
designed for killing civilians, he would be liable because this
particular deal has been accommodated to serve the specific
"purpose" of committing the crime.  Under that interpretation, the
regular mens rea requirements (as described in Art. 30) would
apply—the arms dealer would only have to be aware of the
specific elements that give the arms deal its "purpose."

Thomas Weigend, *How to Interpret Complicity in the ICC Statute*,

(Dec. 15, 2014), *available at* http://jamesgstewart.com/how-to-

intepret-complicity-in-the-icc-statute/.  With the new evidence

provided in the Plaintiffs' Second Consolidated Amended Complaint,

as reaffirmed in the Brief of the Plaintiffs-Appellants before this

Court, the opportunity should be afforded the Plaintiffs to test the

18

evidence against the standard for aiding and abetting confirmed by the international and hybrid criminal tribunals and by legal scholars.

## II. The Absence of Corporate Liability Under the Statutes of the International Criminal Tribunals Does Not Negate Corporate Civil Liability Under the Alien Tort Statute

In *Kiobel II* the Supreme Court did not confirm this Circuit's holding that corporations may not be sued under the Alien Tort Statute. *Kiobel II*, 133 S. Ct. 1659; Judge Scheindlin wrote in her Opinion and Order of August 28, 2014, in this case that, "On April 17, 2014, I held that because the Supreme Court implicitly overruled the Second Circuit's decision in *Kiobel I*, the question of corporate liability remained open in the Second Circuit, and concluded that actions under the ATS can be brought against corporations." (footnotes omitted) Opinion and Order at 6, *In re S. African Apartheid Litig.*, 15 F. Supp. 3d 454 (S.D.N.Y., Aug. 28, 2014) (No. 02 MDL 1499(SAS)).

The statutes of the ICTY, ICTR, SCSL, ECCC, and International Criminal Court do not include corporate criminal liability, but that has no bearing on corporate *civil* liability for "universal" violations of international law. Article 10 of the Rome

Statute emphasizes that the crimes defined in Part II of the Rome Statute (genocide, crimes against humanity (including apartheid), and war crimes) should not "be interpreted as limiting or prejudicing in any way existing or developing rules of international law for purposes other than this Statute." Rome Statute, *supra*, art. 10. If within a national legal system corporations can be liable for criminal or civil penalties for any of these crimes as violations of international law, nothing in the Rome Statute prevents that from occurring as a matter of international law.

In my supplemental amicus brief filed for the reargument pertaining to *Kiobel II* before the Supreme Court, I addressed the much-noted fact that the inability of the ICTY, ICTR, and International Criminal Court to prosecute corporate entities does not extinguish corporate civil liability under the Alien Tort Statute:

> For years prior to the conclusion of the Rome Statute on July 17, 1998, international negotiations were focused on the *criminal* liability of *natural* persons, as had been the case with the [ICTY and ICTR] when they were created in 1993 and 1994, respectively. The U.N. Security Council created the ad hoc tribunals pursuant to its enforcement authority under Chapter VII of the United Nations Charter. The goal each time was to bring the most culpable individual perpetrators to justice for atrocity crimes committed in the relevant territory.
>
> As a key negotiator for the statutes of both of the ad hoc tribunals, I can confirm that there was never any interest in exploring corporate liability in either situation for two reasons.

20

First, corporate liability simply was not the purpose of the ad hoc tribunals; the objective was to bring to justice political and military leaders and, in the case of the [ICTR], certain media tycoons responsible for hate radio broadcasts. Second, for better or for worse, the cast of individual suspects was so large for each ad hoc tribunal that all of our attention, as negotiators representing governments, was on the politicians, military officers, and militia leaders who created hell on earth during those years. There was no particular objection to corporate liability, or any failure to agree on a general principle of international law. Rather, we focused only on individual leaders because that was the objective, and that was more than enough work to keep us busy with the limited U.N. funding that would be available for both tribunals.

Nor was there any serious discussion during negotiations for either ad hoc tribunal of any form of *civil* liability. Following suit, the International Criminal Court from the beginning was designed as, and would be, a criminal court rendering criminal penalties, as had been agreed during the earlier creation of the ad hoc tribunals.

When, however, corporate liability was proposed during the final U.N. negotiations leading to the Rome Statute, it was well known that corporations, so often acting through agents, are held liable for civil damages for the commission of torts in national jurisdictions around the world. The negotiators thus had the opportunity to consider this general principle of law— civil liability for corporate commission of torts—during the Rome Statute negotiations. Again, the reason that that form of liability was not included in the Rome Statute was not…because there is no rule of international law embracing civil liability for corporate misconduct, but because the Rome Statute was conceived as a treaty establishing a *criminal* court with *criminal* penalties, not a court of *civil* claims. Except for the briefest of discussions, considerations of civil liability were outside the realm of Rome Statute negotiations.

Finally, and perhaps most fundamentally, treaty negotiations typically are not exercises in arriving at affirmative decisions to exclude options from the final treaty text. Affirmative decisions are made to include text in the treaty and not necessarily to exclude any particular proposal or provision.

21

> Many drafting proposals are left abandoned in the hallways and in negotiating rooms with polite diplomatic gestures and assurances of good faith consideration. Anyone who suggests….that negotiators in Rome made an affirmative decision to deny corporate liability under the Rome Statute because of an explicit determination based on international law, fundamentally fails to understand the dynamics of such negotiations and their relevance to international law.

Supplemental *Kiobel* Brief, *supra*, at 10–13 (footnotes omitted).

This Circuit misinterpreted federal law and the negotiating history of the Rome Statute in its *Kiobel I* ruling. In connection with the first oral arguments before the Supreme Court in *Kiobel II*, I wrote:

> The [Second] Circuit [in its *Kiobel I* judgment] draws from its misinterpretation of footnote 20 of *Sosa*, *Sosa v. Alvarez-Machain*, 542 U.S. 692, 732 n.20 (2004), the requirement that corporate liability be a "specific, universal, and obligatory" legal norm in order to hold Royal Dutch Petroleum Company or any other corporation liable under the Alien Tort Statute. *Kiobel v. Royal Dutch Petroleum Co.*, 621 F.3d 111, 145 (2d Cir. 2010) (quoting *Sosa*, 542 U.S. at 732). In so misconstruing footnote 20, the Circuit Court requires that the character of the tortfeasor must be firmly established as a matter of international law. The Circuit Court then misinterprets the drafting history of the Rome Statute as revealing that the global community lacks a "consensus among States concerning corporate liability for violations of customary international law." *Id.* at 136–37. This reading of the negotiating history is seriously flawed. The lack of consensus at Rome concerned the varied state of corporate *criminal* liability among national laws and did not pertain to corporate civil liability under either national law or international law.

22

*Kiobel* Brief at 3–4. No conclusion about customary international law should be drawn regarding the exclusion of corporations from the jurisdiction of the Rome Statute. This Circuit's erroneous presumption that the absence of corporate criminal liability in the Rome Statute dictates a rule of customary international law applicable to *civil* liability, misunderstands both international law and the negotiating history of the Rome Statute.

## CONCLUSION

This case has entered new terrain because (1) the totality of the evidence, including new evidence, of corporate complicity with the crime against humanity of apartheid provides ample reason to remand this case so that it can be informed by amended complaints, and (2) the standard for aiding and abetting liability under either customary international law or the Rome Statute recently has been further clarified by the tribunals and by scholars such that a remand of the case would afford the opportunity to test that standard against the evidence. The International Criminal Court recently confirmed an "intends to facilitate" standard for aiding and abetting liability that falls far short of a specific intent standard and closer to the knowledge standard of customary international law, while scholars increasingly

interpret "purpose" in Article 25(3)(c) of the Rome Statute as attaching to the act of facilitation and not to the consummated offense. Two decades of precedent from the other tribunals, reinforced by the *Śainović* judgment and the very recent *Vujadin Popović* judgment by the ICTY, confirms the "knowledge" standard for aiding and abetting liability under customary international law and, along with the International Criminal Court, rejects the specific intent standard.

The long-standing reality of corporate liability under the Alien Tort Statute has withstood challenge in most circuits and the Supreme Court. Any reasoning aimed at knocking out corporate civil liability is contradicted by a large body of federal jurisprudence, including before the Supreme Court and by the lower court in its post-*Kiobel II* ruling in this case in 2014. The absence of corporate criminal liability in the international tribunals is, in this regard, irrelevant to the pending issue, given that the negotiated limitation reflects the narrow objective of individual criminal liability underpinning the tribunals.

Respectfully submitted,


s/ Susan V. Tipograph
Susan V. Tipograph, Esq.
11 Park Place, Suite 914
New York, New York 10007
(212) 431-5360

DAVID J. SCHEFFER
Center for International Human Rights
Northwestern University School of Law
375 East Chicago Avenue
Chicago, Illinois 60611-3069
(312) 503-2224
d-scheffer@law.northwestern.edu

*Counsel for Amicus Curiae*

February 4, 2015

## CERTIFICATE OF COMPLIANCE

Pursuant to Rule 32(a)(7)(C) of the Federal Rules of Appellate Procedure, I certify that, according to the word-count feature of the word processing program, this brief contains 5,820 words and therefore is in compliance with the type-volume limitation set forth in Rule 32(a)(7)(B).

s/ Susan V. Tipograph_____
Susan V. Tipograph, Esq.
11 Park Place, Suite 914
New York, New York 10007
(212) 431-5360

DAVID J. SCHEFFER
Center for International Human Rights
Northwestern University School of Law
375 East Chicago Avenue
Chicago, Illinois 60611-3069
(312) 503-2224
*Counsel for Amicus Curiae*